Mario **FLORES**, Plaintiff–Appellant,

v.

**CARNIVAL CRUISE LINES,** Defendant–Appellee.

No. 93–5209.

United States Court of Appeals, Eleventh Circuit.

March 21, 1995.

Sharon L. Wolfe, Cooper & Wolfe, P.A., Miami, FL, for appellant.

John W. Keller, Keller, Houck & Shinkle, P.A., Keith E. Hope, Law Offices of Keith Hope, Miami, FL, for appellee.

Before KRAVITCH and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.

CARNES, Circuit Judge:

This case presents a novel question: if a seaman whose income consists mainly of tips becomes ill or injured and is unable to work, can he recover those tips under the remedy for wages that is provided by admiralty law? We hold that the average tip income the seaman was earning prior to his incapacitation is to be included in the measure of wages he is due if he becomes unable to work.

## I. FACTS AND PROCEDURAL HISTORY

Mario Flores is a seaman who signed two consecutive employment contracts to work as a cabin steward on cruise ships owned by Carnival Cruise Lines. Flores entered his first contract with Carnival in September 1991 to work for one year on the MS Ecstasy. The contract promised Flores a salary of $45 a month, to be paid every two weeks, and further provided:

> If you have been contracted as a ... CAB-IN STEWARD, in addition to your monthly salary you may expect daily tips for your services to the passengers .... [T]he tips you may expect go as high as $1000.00 a month. Carnival will take it upon itself to inform passengers of what is customarily tipped for the work that you perform.

The underlined words and figures were typed into blank spaces on the original printed form.

Flores claims that he worked on the Ecstasy until April 27, 1992, earning tips of $800 a week. Then he fell ill and went ashore for medical treatment. While ashore, Flores received bi-monthly checks for "unearned wages" from Carnival in the amount of $161.97. That amount was the same as Flores's vacation pay would have been, and it was equal to the wages of the lowest-paid non-gratuity-earning crew member.

Flores stayed ashore from April 27, 1992, until his first contract expired at the end of September 1992. When his first contract expired, Flores signed a second, six-month contract to work on the MS Fantasy. The second contract contained exactly the same payment terms as the first. Flores claims that he worked on the Fantasy from September 28, 1992, to October 19, 1992, earning tips of $600 a week. On October 19, the ship doctor sent him ashore again, where Flores remained until the expiration of his second contract.

Flores filed a class action suit under Fed. R.Civ.P. 23 against Carnival Cruise Lines, seeking compensatory and punitive damages on behalf of all tip-earning crew members of

the Carnival Cruise Lines fleet who became sick or were injured in the three years preceding the filing of Flores's suit and who did not receive "reasonably anticipated lost tips or in the alternative, monthly guaranteed tips." Carnival filed a motion to dismiss the complaint, maintaining that it had no legal duty to pay Flores anything more than his $45–per–month salary as unearned wages.

A magistrate judge first issued an order treating Carnival's motion to dismiss as a motion for summary judgment, and then issued a report and recommendation concluding that "tips which are not guaranteed, ... and not specific ... would not be appropriately includable as wages...." However, finding merit in Flores's contention that he had been guaranteed tips by Carnival, the magistrate judge determined that a genuine issue of material fact existed to preclude summary judgment. Carnival filed an objection to the magistrate judge's report and recommendation.

"After a de novo determination, and considering the Report and Recommendation, the written objections, and the record herein," the district court entered an order granting summary judgment for Carnival on both the compensatory and punitive damages claims based upon its determinations that the written contract did not guarantee "any particular amount of tips" to Flores and that any alleged oral promise of tips made at the time Flores signed the contract was merged into the written agreement and barred by the parol evidence rule. Flores appeals the summary judgment ruling.

## II. DISCUSSION

■ We review de novo a district court's grant of summary judgment, considering the evidence in the light most favorable to Flores. *First Union Discount Brokerage Serv. v. Milos,* 997 F.2d 835, 841 (11th Cir. 1993). Because we have no precedent direct-

ly addressing the issue of whether a sick or injured seaman whose income consisted primarily of tips may recover lost tip income as part of the wages remedy, we consider the purposes and policy underlying the maritime remedy for wages, the decisions of courts that have considered similar questions under the rubric of nonmaritime workers' compensation law, and the actual wording of Flores's contract. These factors lead us to conclude that Flores may recover his average tip earnings as unearned wages.

### A. THE INCLUSION OF TIPS IN THE MEASURE OF UNEARNED WAGES UNDER ADMIRALTY LAW

#### 1. The Purpose and Policy Underlying the Wages Remedy

Under general maritime law, Flores is entitled to bring an action for "maintenance and cure," a remedy available to compensate seamen who fall ill or become injured during their employment. "The cause of action for maintenance and cure includes three specific items of recovery: (1) maintenance, which is a living allowance; (2) cure, which covers nursing and medical expenses[;] and (3) wages." Herbert R. Baer, *Admiralty Law of the Supreme Court* 6 (3d ed. 1979); see 1B *Benedict on Admiralty* § 43 (Aileen Jenner ed., 7th ed. 1994); Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* 309 (2d ed. 1975). Unearned wages are measured from the time of the seaman's incapacity until the end of his employment contract. See *Archer v. Trans/American Serv., Ltd.,* 834 F.2d 1570, 1575 (11th Cir. 1988).

Although the recovery of unearned wages technically is a separate element of recovery from those for maintenance expenses or cure expenses, "it is settled law that wages is a basic component of an award of maintenance and cure." *Id.* at 1574. For that reason, our references to "maintenance and cure" are meant to include the wages remedy. Maintenance and cure is a remedy with roots in the medieval sea codes;[1] it is a remedy designed

---

1. For example, Art. VII of the Laws of Oleron, an ancient maritime code dating to approximately 1200 A.D., states:

If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore, to provide lodging and candlelight for him, and also to

to protect seamen from the perils of living and working at sea. To recover in a maintenance and cure action, the seaman need not suffer from illness or injury that is causally related to his duties, *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 527, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938), as long as the seaman's incapacitation did not result from his own wilful misconduct. *Garay v. Carnival Cruise Line, Inc.,* 904 F.2d 1527, 1530 (11th Cir. 1990), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991).[2]

The seaman's right to maintenance and cure was firmly endorsed in *Harden v. Gordon,* a famous circuit opinion by Justice Story:

> Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. Their common earnings in many instances are wholly inadequate to provide for the expenses of sickness ....

11 F.Cas. 480, 483 (C.C.D.Me.1823) (No. 6,047). The Supreme Court has noted that "[i]t has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations." *Farrell v. United States,* 336 U.S. 511, 516, 69 S.Ct. 707, 709–10, 93 L.Ed. 850 (1949).

The traditional breadth of the remedy, as well as its nature and purpose, support Flores's contention that the measure of his unearned wages should include the tips he would have earned had he not become disabled. The Supreme Court has repeatedly declared that "the shipowner's liability for maintenance and cure was among 'the most pervasive' of all and that it was not to be defeated by restrictive distinctions nor 'narrowly confined.'" *Vaughan v. Atkinson,* 369 U.S. 527, 532, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962) (quoting *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 730, 735, 63 S.Ct. 930, 933, 936, 87 L.Ed. 1107 (1943)). Moreover, "[w]hen there are ambiguities or doubts, they are resolved in favor of the seaman." *Vaughan,* 369 U.S. at 532, 82 S.Ct. at 1000. The purposes of the maintenance and cure remedy include protecting "poor and friendless" seamen, encouraging shipowners to guard the safety and health of working seamen, and inducing seamen to accept duty at sea. *Calmar,* 303 U.S. at 528, 58 S.Ct. at 653.

The remedy has served its purposes well over the centuries. Until recently, no luxury cruise ships, no cabin stewards, and no system of compensation through tips from passengers existed to complicate the disabled seaman's simple right to recover wages. It is altogether fitting, however, that an ancient remedy born of the reality of the seaman's position should be applied to fit the reality of our modern times. That reality is reflected in the contract between Carnival and Flores, which acknowledges that the bulk of Flores's compensation would come not from the mere pittance of $45 a month that Carnival agreed to pay, but from the hundreds of dollars in tips Flores would receive each week from Carnival's passengers, at Carnival's urging. The contract itself stated the shipowner's own expectation that Flores's tips could be as much as twenty times more than his salary,

---

spare him one of the ship-boys, or hire a woman to attend him ... [.] [I]f he recover, he ought to have his full wages, deducting only such charges as the master has been at for him. And if he dies; his wife or next kin shall have it.

1B *Benedict on Admiralty* § 41. Other ancient sea codes contain similar provisions. *See id.*

**2.** In addition to the right of maintenance and cure, an injured seaman has two other possible avenues of recovery for an injury: (1) an action under general maritime law for unseaworthiness, *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 548–49, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960); and (2) a statutory remedy under the Jones Act, 46 U.S.C. § 688, for any breach of the employer's duty, including negligence. No allegations of unseaworthiness or negligence have been made in this case.

which amounted to less than two dollars a day. That is the reality of the situation.

## 2. The Analogy to Workers' Compensation Law

Although we can find no admiralty cases on point, we do draw guidance from workers' compensation cases defining "average weekly wage" to include not only base salary but also average tip income. Employees in certain service professions have traditionally relied upon tips for a significant portion of their income. Waiters and waitresses, for example, might receive only the statutory minimum wage from their employer yet earn most of their income from tips. An overwhelming majority of the courts that have considered this question have determined that that tip income is recoverable as part of an individual's "average weekly wage" under workers' compensation laws. A recent annotation of state court opinions addressing the specific question of whether tips or gratuities should be included in average weekly wages for purpose of workers' compensation remedies notes:

Every court which has considered "tip" cases under statutes defining average weekly wage as the weekly wage earned by an employee at the time of his or her injury has determined that such tips constitute earnings and are to be factored into the calculation of compensation.

Jane Massey Draper, Annotation, *Workers' Compensation: Tips or Gratuities as Factor in Determining Amount of Compensation,* 16 A.L.R. 5th 191, 205 (1993).[3] The reasons given by an Arizona state court apply equally to Flores's situation:

[T]he loss of income from tips is as real as the loss of income from employer disbursements. The manifest injustice of compensating for the losses stemming from one source but not from the other has been a persuasive force in the development of [workers' compensation] law.

*Scott v. Industrial Comm'n,* 122 Ariz. 169, 171, 593 P.2d 919, 921 (Ct.App.1978). Just as it does not matter for maintenance and cure purposes whether Carnival had any hand in causing Flores's illness, so it should not matter whether Flores's income came directly

3. The Draper annotation compiles nearly fifty cases addressing inclusion of gratuities in the form of tips, from twenty-two states and the District of Columbia. Every one of the twelve annotated cases in which courts refuse to allow the employee to include tips rejects the worker's claim because: (1) the employer was unaware that the employee was receiving tips because the employee had not followed mandatory statutory or regulatory reporting procedures; (2) the state statute expressly excludes gratuities from the wages calculation; or (3) the hiring contract did not anticipate that the employee would receive tips. Draper at § 2a; *see, e.g., Sears, Roebuck & Co. v. Viera,* 440 So.2d 49 (Fla.Dist.Ct.App.1983) (disallowing tips where no evidence offered to show that employer knew or could have known that claimant had received tips); *Coates v. Warren Hotel,* 18 N.J.Misc. 363, 13 A.2d 787 (Ct.C.P. 1940) (excluding tips based upon statute that expressly did not include gratuities); *Anderson v. Horling,* 214 A.D. 826, 211 N.Y.S. 487 (App.Div. 1925) (excluding tips because parties did not take tips into consideration when making contract). None of those reasons are applicable to this case.

Other cases allow the employee to recover tips, even if the statute expressly prohibits inclusion of gratuities, by reasoning that tips are distinguishable from gratuities. *See, e.g., Petrafeck v. Industrial Comm'n,* 191 Colo. 566, 554 P.2d 1097 (1976) (en banc) (excluding tips would defeat purpose of workers' compensation); *Sturgill v. M*

*& M, Inc.,* 329 A.2d 360 (Del.1974) ("gratuity" in dictionary sense meant something over and above amount earned, while waitress's "tip" was bargained-for recompense and implicit consideration in contract for hire); *Hopkins v. Fred Harvey, Inc.,* 92 N.M. 132, 133, 584 P.2d 179, 180 (Ct.App.) ("When it is within the contemplation of the parties that tips are to be retained by an employee as part of his compensation, they are to be regarded as wages for compensation purposes."), *cert. denied,* 92 N.M. 180, 585 P.2d 324 (1978). Still others include tips despite the fact that the employee did not conform to a statutory reporting requirement, because the employer knew that the employee was receiving tips but had failed to establish a reasonable reporting procedure. *See, e.g., Hanks v. Tom Brantley's Tire Broker,* 500 So.2d 614 (Fla.Dist.Ct.App. 1986); *Nash v. Holiday Inn at Calder,* 395 So.2d 306 (Fla.Dist.Ct.App.1981).

Some cases even suggest that to prevent tip-earning employees from including tips in their wages would violate the equal protection clause of the United States Constitution. *See, e.g., Petrafeck,* 554 P.2d at 1098 (finding equal protection violation in distinction between employees earning tips as part of contract and hourly wage earners); *Senor T's Restaurant v. Industrial Comm'n of Arizona,* 131 Ariz. 360, 364, 641 P.2d 848, 852 (1982) (en banc) (interpreting statute to include tips in wages in order to avoid addressing question of equal protection violation).

from Carnival or indirectly, in the form of tips given by Carnival's passengers at Carnival's urging.

Carnival argues that the analogy to state workers' compensation laws is not apt, because of the differences between that system of compensation and the recovery rights of seamen. It notes that maritime labor unions have jealously guarded their "basket of remedies"—maintenance and cure actions, Jones Act negligence claims, and general maritime law claims of unseaworthiness—against legislative attempts to replace those remedies with a maritime equivalent to state workers' compensation schemes. Unlike seamen, who have remedies both for injuries completely unrelated to their employment and for those arising from negligence or other breaches of an employer's duties, employees under workers' compensation laws generally trade their ability to claim enhanced damages for the security of a no-fault liability system. Carnival contends that this Court therefore should not "engraft" the definition of wages from state workers' compensation schemes onto the maritime remedy of maintenance and cure.

We are not persuaded by Carnival's arguments. While different remedies apply in the workers' compensation and admiralty areas, the fact remains that the wage remedy in each seeks to compensate the injured or disabled employee for compensation lost because of absence from the job. Both measure the compensation due in terms of the worker's or seaman's lost "wages." The two situations are analogous to that extent, and we find the reasoning of the workers' compensation cases persuasive.[4] "Wages" includes average tip income, at least where, as here, the employer and employee anticipate that tips will be a substantial part of the compensation received.

### 3. The *Griffin* and *Lamont* Decisions

Carnival argues that its position finds substantial support in *Griffin v. Oceanic Con-*

*tractors, Inc.*, 664 F.2d 36 (5th Cir. Unit A June 1981), *rev'd on other grounds*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). In that case, the Court rejected Griffin's contention that, as a seaman, he was due a maintenance and cure remedy that included bonus and overtime pay. However, Griffin would have received bonus pay only upon completion of his term of employment, and he had forfeited any claim to such pay when, after recovering from his injury, he accepted employment elsewhere instead of returning to his ship. *Id.* at 39–40. By contrast, both parties in this case anticipated Flores would receive substantial tips each week he labored, and Flores was unable to return to his ships before his contracts expired.

The *Griffin* Court also denied overtime pay for the short period of time Griffin had worked on the ship, because "the actual amount of overtime was uncertain, and hence any inclusion of such would have been purely speculative." *Id.* at 40 (citing *Keefe v. American Pac. S.S. Co.*, 110 F.Supp. 853, 856 (S.D.Cal.1953) (denying overtime to seaman because "[a]ctual earning of overtime was an event which might or might not occur. It depended upon many contingencies.")). Again, the present case is different. Flores worked long enough that the actual amount of tip compensation he would have received had he been able to continue working can be determined without undue speculation.

The decision in *Lamont v. United States*, 613 F.Supp. 588 (S.D.N.Y.1985), is closer to the case at hand. In *Lamont*, a seaman whose overtime earnings had amounted to ninety-one percent of his base wages was held to be entitled to include the amount of that overtime pay in the wage component of his maintenance and cure remedy. Looking at the "custom and practice" on the seaman's ship of paying overtime in amounts nearly equal to the amount received as base wages, the *Lamont* court noted:

---

4. Consulting non-maritime decisions to answer an admiralty question is not without precedent. For example, we have previously looked to "non-maritime common law dealing with termination of the at-will employment relationship" before determining whether a seaman could include a retaliatory discharge claim in his Jones Act action. *Smith v. Atlas. Off–Shore Boat Serv., Inc.*, 653 F.2d 1057, 1060–63 (5th Cir. Unit A August 1981) (establishing retaliatory discharge claim under Jones Act in absence of any direct admiralty law precedent).

[T]he payment of unearned wages to an ill or injured seaman includes the full amount reasonably expected by the parties to be paid during the voyage .... The expectation of "overtime" amounting to almost 100 percent of the base rate has led the parties to the major collective bargaining contracts covering American seamen to provide that generally sailors will be aboard ship only six months out of each year. This [was] done because it is the common expectation of the parties that the seaman will be able to earn the annual base income when "overtime" is included in the six months pay.

*Lamont,* 613 F.Supp. at 593. The situation involving Flores's tip income presents an even more compelling case for inclusion than did the seaman's overtime claim in *Lamont.* The "custom and practice" and the expectation of the parties here was that the tip income Flores would receive would be as much as 2200% of his monthly salary.

### 4. Carnival's Remaining Arguments

In addition to those that we have disposed of in the course of our prior discussion, Carnival makes other arguments that merit a response. For one thing, Carnival contends that applying traditional principles of contract law to the contract in this case leads to the conclusion that Flores's claim should be rejected. The district court denied Flores's claim for that reason, but Flores's claim is not for breach of contract. It is for maintenance and cure. The Supreme Court has declared that the right to maintenance and cure "differs from rights normally classified as contractual." *Vaughan,* 369 U.S. at 532, 82 S.Ct. at 1000. The shipowner's duty to provide maintenance and cure is contractual "in the sense that it has its source in a relation which is contractual in origin, but, given the relation, no agreement is competent to abrogate the incident." *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932); *see Dowdle v. Offshore Express, Inc.,* 809 F.2d 259, 263 (5th Cir.1987) ("the seaman's right to unearned wages also may not be contractually abrogated"). Our analysis of Flores's claim is not confined to contract law. Instead, it is enough for our purposes that Flores's contract anticipated both that the seaman would receive tips, and that those tips would form the bulk of his employment income.

Carnival also argues that including tip income in the definition of "wages" for maintenance and cure purposes will lead to fraudulently inflated claims and leave ships at the mercy of unscrupulous seamen. Carnival points out that cabin stewards generally are not required to report their tip income and could easily inflate that which they had received in order to increase their recovery.[5] We reject this argument for three reasons. First, if the threat of fraudulent claims is sufficiently serious, Carnival can institute a system in which tips are reported, or even funnelled through a central point for bookkeeping purposes on the way to the recipients. Cruise lines have created the current system of tips as wages for their own economic benefit, and they are free to make such modifications as their interests require.

Second, courts are in the business of distinguishing valid from invalid claims. Disabled seamen are not the only individuals with an incentive to give less than truthful testimony. Criminal defendants have an even stronger incentive to lie, but the courts have not proven powerless to protect their judgments in criminal cases from the effect of false testimony. We have held, for example, that the jury as factfinder is not compelled to accept the uncontradicted testimony of a criminal defendant and can even infer that the opposite of that testimony is true. *See United States v. Allison,* 908 F.2d 1531, 1535 (11th Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 77 (1991); *see also United States v. Goggin,* 853 F.2d 843, 846 (11th Cir.1988); *United States v. Bennett,* 848 F.2d 1134, 1139 (11th Cir.1988). Likewise, an admiralty court has authority, in proper circumstances, to reject as untruthful even uncontradicted testimony concerning the amount of tip income a seaman earned

---

**5.** Apparently Flores is not a United States citizen and does not pay federal income tax on his tip income.

before becoming unable to continue work. Moreover, the court can consider the amount of tips the ship told the seamen he could expect as well as the amount of tips those who remained on board actually received.

Finally, we reject Carnival's possibility of fraud argument because it would be grossly unfair to deprive all seamen in Flores's position of any semblance of a fair recovery simply because some might attempt to recover more than the amount to which they are entitled. While it is not certain that some seamen will obtain more than they are entitled if we allow them to include lost tip income in the measure of unearned wages, it *is* certain that all seamen will receive less than they are entitled if we do not permit them to do so.

## B. THE CALCULATION OF TIPS AS UNEARNED WAGES

Having determined that for maintenance and cure purposes Flores's "wages" includes his tips, we turn to the question of how to calculate the unearned tips. Once again, we consider the principles underlying the maintenance and cure remedy and the analogous situation under workers' compensation law.

The seaman's action for maintenance and cure may be seen as one designed to put the sailor in the same position he would have been had he continued to work: the seaman receives a maintenance remedy, because working seamen normally are housed and fed aboard ship; he recovers payment for medical expenses in the amount necessary to bring him to the maximum cure; and he receives an amount representing his unearned wages for the duration of his voyage or contract period. Because in Flores's case, unearned tips are not predetermined and are not paid by the employer, the most principled way to calculate the tips he would have earned is to assume that Flores's average weekly tips for the work he performed on each ship was the amount of tips he would have earned each week had he stayed on each ship. Such an assumption is used in workers' compensation cases that allow inclusion of tips. *E.g., Señor T's,* 131 Ariz. at 362, 365, 641 P.2d at 850, 853 (affirming inclusion of $400-per-month tip income in average

monthly wage). We have no reason to assume otherwise.

Therefore, the district court should first determine for each of the two ships the average amount of tips Flores received weekly before he had to leave the ship. The court should add $10.40 (the $45-per-month salary divided by four and one-third weeks in each month) to that average weekly amount. The resulting figure should be multiplied by the number of weeks Flores was unable to work on that ship until the end of his contract. The trial court should subtract from that total the amount Carnival has already paid Flores as his unearned wages.

## C. THE PUNITIVE DAMAGES CLAIM AND THE MOTION FOR ATTORNEY'S FEES

In addition to his wages claim, Flores argues that he should receive punitive damages because Carnival's refusal to pay him his unearned wages was willful and arbitrary. He has also filed a motion for attorney's fees related to this appeal.

Because this is a case of first impression, Carnival did not abrogate any established legal duty toward Flores, and therefore did not exhibit willful and wanton misconduct, which is the standard Flores must meet to recover punitive damages in admiralty law. *Hines v. J.A. Laporte, Inc.,* 820 F.2d 1187, 1188 (11th Cir.1987). Furthermore, Carnival paid Flores more than $45 a month while he was incapacitated, and Flores apparently did not object to the sums he was receiving as unearned wages prior to the expiration of the second contract and the initiation of this suit. We do not think, under these circumstances, that Carnival acted in bad faith, callously, or unreasonably, which is the standard for award of attorney fees in admiralty law under *Nichols v. Barwick,* 792 F.2d 1520, 1524 (11th Cir.1986).

## III. CONCLUSION

Flores's motion for attorney's fees is DENIED. The district court's grant of summary judgment against Flores on the punitive damages claim is AFFIRMED. The district court's grant of summary judgment

against Flores on his compensatory claim is REVERSED, and the case is remanded for further proceedings consistent with this opinion.[6]

---

6. The district court did not reach the issue of class certification, and neither do we.