James P. GRAHAM, Jr., Plaintiff,

v.

FIRST UNION NATIONAL BANK OF
GEORGIA, et al., Defendants.

Civil Action No. 97–C–805–E.

United States District Court,
M.D. Alabama,
Eastern Division.

April 10, 1998.

Michael J. Bellamy, Phenix City, AL, Kenneth Leroy Funderburk, Funderburk, Day & Lane, Phenix City, AL, for Plaintiff.

Jeffrey A. Brown, W. Donald Morgan, Jr., Rothschild & Morgan, Columbus, GA, for Defendants.

## MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

## I. INTRODUCTION AND PROCEDURAL HISTORY

On April 15, 1997, the plaintiff, James P. Graham Jr., filed this action in the Circuit Court for Russell County, Alabama, against First Union National Bank of Georgia and First Union Mortgage Corporation. The complaint alleges that the defendants committed fraud by misrepresentation and fraud by suppression. The case was removed to this court on May 21, 1997. On December 8, 1997, the defendants filed a counterclaim for recission of contract. The court permitted an amendment to the counterclaim on January 8, 1998. Currently pending before the court is a motion for summary judgment filed by the defendants on January 21, 1998 directed to plaintiff's claims.[1] The plaintiff has filed an extensive response to the motion.[2]

---

1. On February 27, 1998, the plaintiff filed a motion for summary judgment directed at the defendants' counterclaim. The relief requested in the counterclaim is not an issue unless the jury returns a verdict in favor of the plaintiff. Consequently, the court views a ruling on plaintiff's motion at this time as unnecessary. The court will issue a ruling on the motion, if necessary, after the jury has returned a verdict.

2. The court has, by separate order, denied a motion filed by the defendants to strike two affidavits offered by the plaintiff in opposition to the motion.

## II. FACTUAL BACKGROUND [3]

On August 11, 1976, Thomas and Joan Godfrey purchased a parcel of real property in Russell County, Alabama described as Lot 111, Whiterock Subdivision. They executed a note and mortgage in favor of American Federal Savings and Loan Association of Columbus, Georgia. On April 26, 1978, the Godfreys sold the property to John and Barbara Wilson. The warranty deed prepared in connection with the sale shows that the property was subject to the original American Federal mortgage. The deed also recites that the Wilsons agreed to assume the original mortgage at the original interest rate of 9%. A little over a year later, on September 28, 1979, the Wilsons sold the property to Billy and LaDonna Donaldson. The Donaldsons assumed the original American Federal loan, according to the warranty deed. According to a separate document which is entitled "FHLMC Assumption and Release Agreement," the Donaldsons assumed the loan at a rate of 10%. In June 1982, apparently following a divorce, LaDonna Donaldson conveyed all of her interest in the property to Billy Donaldson. Sometime after this transaction, the American Federal through subsequent assignments came to be owned by the defendant First Union National Bank of Georgia. The other defendant, First Union Mortgage Corporation, acts as servicing agent for First Union, the bank.[4]

In December 1995, Billy Donaldson contracted with Marshall and Sylvia Williams to buy the property at Lot 111 Whiterock Subdivision. The plaintiff, James A. Graham, Jr., was the attorney assigned to perform the closing of this transaction. Graham is a Phenix City, Alabama, attorney with an extensive real estate practice. He is assisted in his real estate practice by an experienced paralegal, Joan Herring, who bears the office title of Real Estate Coordinator. Graham contracts virtually all of his title work to a title abstractor named Bonnie Smith. In his deposition, Graham testified about Herring's responsibilities and his relationship with Smith:

> Joan is the contact person from real estate agents, builders, mortgage companies, that they want us to close a loan. She's the one that communicates with Bonnie Smith or whoever is doing the—
>
> Every once in a while Bonnie will be tied up and we'll have to use someone else, but I would say Bonnie does ninety-nine percent of the stuff.
>
> She sets up the closings with the real estate agents and mortgage companies and she and her assistant, Debbie Davis, get all of the information from the mortgage company on the loans and they prepare the loan documents in anticipation of closing.[5]

Bonnie Smith was assigned to do the title work for the transaction between Donaldson and the Williams. In the course of doing that work, she prepared a document called a "pencil chain" which shows the various transactions on a piece of property. The pencil chain prepared for the transaction at issue in this case shows an outstanding mortgage to American Federal dated August 11, 1976. This is the original mortgage on the property made to the original purchasers, Thomas and Joan Godfrey. The sheet also showed tax liens, a mortgage to First Capital and an assignment to Fleet Finance. According to Smith, it was clear from her pencil chain that the American Federal mortgage had not been canceled.

The transaction between Donaldson and the Williams was to be a first mortgage which meant that any existing indebtednesses was to be paid off and the new lender was to receive a purchase money primary security interest. In order to determine what payoffs needed to be made, Herring had Donaldson or his second wife Carla, provide her with copies of the information concerning their mortgage companies and account num-

---

**3.** In reciting this factual background, the court, as it must, views the evidence and all inferences arising therefrom in a light most favorable to the non-movant. *Westchester Specialty Ins. Serv. v. U.S. Fire Ins. Co.,* 119 F.3d 1505, 1509 (11th Cir.1997). Further, the court notes that it has considered all of the evidence in support of and opposition to the motions for summary judgment.

**4.** The court uses the term "First Union" to refer to the defendants collectively.

**5.** Graham deposition at 27–28.

bers. She also referred to the title work done by Bonnie Smith.[6]

Donaldson furnished Herring with a loan payoff statement he had obtained from First Union Mortgage Corporation. The payoff statement indicated that there was a mortgage held by FUMC on property owned by Donaldson at 148 Lee Road 602, Phenix City, Alabama, which is in Lee rather than Russell County. Lot 111, Whiterock Subdivision is, of course, in Russell County, not Lee. The 148 Lee Road address is not the address of the property at Lot 111 Whiterock Subdivision. Herring testified both in her deposition and by affidavit that she contacted the Payoff Department at First Union Mortgage about the discrepancy in the address on the payoff statement. She was told by an unnamed person that the account number which was listed on the payoff statement given to her by Donaldson was for the Lee Road property, not the Whiterock Subdivision property which was to be the subject of the closing.[7] She was also told that First Union Mortgage did not have a mortgage on Lot 111 of the Whiterock Subdivision. In response to that information, Herring asked the person in the Payoff Department to send Graham a power of attorney so that they could cancel the mortgage of record. Herring further states, in her affidavit, "Based on the representation of First Union that they had no outstanding mortgage on Lot 111, Whiterock Subdivision, that a power of attorney would be forwarded to us by First Union, the loan was closed without paying money to First Union." Herring goes on to state in her affidavit:

> This office still closes loans for First Union and based on my dealings with First Union and other lenders, it is common practice in this area to take the word of mortgage companies. When you call a lender and they give you a payoff or tell you that money is owed or is not owed on a piece of property where there is an unsatisfied mortgage, it is customary that as manageable lenders, you can believe what they say regarding what is owed them. It is common and customary that you can rely upon the word of a lending institution, such as First Union, when they tell you they will send you a power of attorney to satisfy a certain mortgage on which they claim no debt. This Donaldson case is the only time that any lending institution has ever failed to send me a power of attorney when they told me that they would do so.

Graham closed the transaction on the Russell County property, Lot 111, Whiterock Subdivision, between Donaldson and the Williams in January 1996.

In March 1996, First Union sent Chuck Christian, a Phenix City real estate appraiser, to Donaldson's home in Lee County, 148 Lee Road, to inspect it as a prelude to foreclosure. He was not sent to inspect the property at Lot 111, Whiterock Subdivision, which was the property subject to First Union's mortgage. Donaldson told Christian at the time of inspection that First Union did not have a mortgage on the Lee County property and told him to contact the plaintiff. Christian was again asked to inspect Donaldson's home in Lee County and did so on June 29, 1996. Prior to the inspection, Christian was informed by First Union that it had a mortgage on the Lee County property.[8]

On September 30, 1996, First Union sent a letter to Donaldson by certified mail at his address in Lee County telling him that he was behind in his mortgage payments. The letter reads in pertinent part:

> As a result of the breach of the Note and Security Instrument, please be advised of the following:
>
> 1. The breach of the aforementioned Note and Security Instrument was a result of the failure on your part to pay the monthly installments.
>
> 2. To cure this breach, you must pay the past due installments and late charges. The current amount due is $3,155.50. Additional amounts such as upcoming payments and late charges must be included

---

**6.** Herring deposition at 15–16.

**7.** *Id.* at 16–17.

**8.** *See* Affidavit of Chuck Christian filed February 13, 1998 with Plaintiff's Response to the Defendants' Motion for Summary Judgment, Exhibit D.

as they become due. These funds must be certified and in our office on or before 30 days from the date of this letter.

3. The failure on your part to cure this breach on or before 30 days from the date of this letter will result in the loan maturity being accelerated and payment of the total indebtedness will be required in order to avoid disclosure.[9]

Sometime after he received the foreclosure letter, Donaldson contacted Graham. Donaldson told Graham that First Union was going to foreclose on his Lee County house. Graham told Donaldson that he had not closed the loan on his Lee County house. As a precaution, however, Graham told Herring to pull the Donaldson file. It was then that he discovered the title work showing an outstanding mortgage to First Union on Lot 111, Whiterock Subdivision, the Russell County property that Donaldson sold to the Williams. Graham also pulled the payoff statement from First Union which incorrectly showed that the loan was on the Lee County property, not Lot 111 Whiterock Subdivision, the Russell County property.[10] Graham then told Herring to call First Union and ask them about the discrepancy. Herring phoned First Union and found that there was a question about whether the mortgage was on property in Lee County or Russell County.

Herring had some phone contact with personnel at First Union. Graham also decided to become personally involved and he called First Union. He talked first with Kristen Overcash. In his deposition, Graham described his discussion with Overcash:

Basically, I said Ms. Overcash, I said we closed a loan that we got a payoff letter that showed as the property address a Lee Road address, and now I'm afraid that it was on the Russell County property that we closed because ya'll have sent someone out to foreclose on the Lee County property, and I said I'm concerned because I've written title insurance on the Russell County property and I need to get this straightened out because I don't want you

foreclosing ultimately on a mortgage that I certified title to. I said I'll try to—I said even though—and I can't and I think I asked Ms. Overcash, I said look, I would be willing to buy the paper on this loan if ya'll would waive some of the penalties and the interest that had accrued because ya'll sent me the wrong payoff, and as long as I can be put in a position where I can collect my money, I said but if—how about—and she said well, I can't make that decision, she said I'll have to refer you to—and I'm assuming Janet Teter (sic) is an attorney.[11]

On January 2, 1997, Herring received a letter from First Union setting out the payoff. Despite the discussions concerning a possible mistake, the payoff letter again shows the property which was subject to the mortgage to be 148 Lee Road 602, Phenix City, Alabama, which is property located in Lee County, not Russell County. After receiving the letter, Herring communicated with Overcash about the amount of money which would have to be paid to First Union for an assignment of the loan which was on the Whiterock Subdivision property in Russell County. He was informed either directly or through Herring that the amount was $23,552.01.

Sometime in January, Graham talked by phone with Joan Tedder, who is a legal support specialist with First Union. Herring was present during these conversations. The affidavits of Graham, Herring and Tedder all establish that Graham offered to pay any note due on the mortgage which was still outstanding on Lot 111, Whiterock Subdivision but that he wanted an assignment of the note so that he could sue Donaldson to recover the money he was going to pay to First Union. As Tedder indicates in her affidavit:

My recollection of my conversations with Mr. Graham and/or Ms. Herring was that Mr. Graham was quite cordial and indicated strongly that he wanted to payoff FUMC so the mortgage would not be foreclosed on and no claim would be made either against him or against his insurance company. He indicated forthrightly that he had closed over the existing mortgage

9. Complaint, Exhibit 8.

10. Graham deposition at 50–51.

11. Graham deposition at 52–53.

and that it was his error. He indicated in our telephone conversations only that he wanted to be placed in the same position so that he could sue Mr. Donaldson.[12]

The facts stated in Graham's affidavit are similar but he is more specific on points which are critical to his case. In his words:

> Between January 15, 1997 and January 30, 1997, I had conversations with Janet Tedder and other people with First Union regarding the purchase of the note and mortgage on this loan "with recourse" referencing to the Billy Donaldson loan. During my conversations with First Union Mortgage Corporation employees, I was informed by them that they had a note signed by Billy J. Donaldson, bearing interest at the rate of ten (10%) per annum and that for $23,552.01, they would assign the same to me with recourse. I was assured that I would be able to sue Billy J. Donaldson as a holder in due course for value under this note and recover my money. I would not have bought this loan, had I known that First Union Mortgage Corporation did not have such a note in hand executed by Billy Donaldson on which he owed $23,552.01 plus interest at ten (10%) and which they could assign to me, with recourse, placing me in the position of a holder in due course for value.[13]

During this same time period while Graham was negotiating the assignment of the mortgage on Lot 111, Whiterock Subdivision, First Union was still proceeding on its foreclosure on Donaldson's house in Lee County even though they had no mortgage on that property. On January 23, 1997, Chuck Christian, at the direction of First Union, again inspected Donaldson's Lee County home. Donaldson again told Christian that he did not owe any money to First Union on his Lee County property and Christian told Donaldson that First Union claimed that he did and that they intended to foreclose on the

property. Also during this time period, Herring sent a letter to Tedder which read in pertinent part:

> As per your conversation with Mr. Graham, following [sic] please find copies of the both payoff statements provided by First Union Mortgage Corporation. Both statements show the property address as being "148 Lee Road 602, Phenix City, Alabama 36867." The property which should have been on the statement and which was sold at closing is "20 Ford Road, Phenix City, Alabama 36869." [14]

On February 6, 1997, a cashier's check in the amount of $23,552.01 was sent to Overcash at First Union Mortgage Corporation. In the letter of transmittal, Graham wrote, "As per our conversation, please forward to me the assignment of all rights under the note and mortgage on this loan with recourse." [15] Sometime before March 19, 1997, the defendants provided Graham with a series of documents. Included in the documents was a lost note affidavit. Graham has retained an expert witness who is prepared to testify that the documents which Graham received from First Union are insufficient to allow Graham to prevail in litigation against Donaldson over the note.[16]

On March 19, 1997, counsel retained by Graham wrote a letter to Overcash outlining the deficiencies in the documents which Graham received. The letter concludes:

> Based upon the representations made by First Union to Mr. Graham regarding this Note and the problems with documentation, Mr. Graham is giving you an opportunity to correct this matter before he is required to bring a suit against you for fraud. You may correct this matter by returning to him the $23,552.01 plus interest from February 7, 1997 at ten (10%) plus $2000.00 for the cost of handling this matter. You should do so within 10 days

**12.** Affidavit of Janet W. Tedder at 3, filed January 21, 1998 in support of Defendants' Motion for Summary Judgment.

**13.** Graham affidavit at 3.

**14.** Exhibit F, Plaintiff's Response to Defendants' Motion for Summary Judgment.

**15.** Complaint, Exhibit 11–A.

**16.** *See* Written Disclosure of W.L. Longshore, Exhibit F to the Plaintiff's Response to Defendants' Motion for Summary Judgment.

of the date of this letter, or appropriate legal action will be taken.[17]

On March 31, 1997, First Union responded by a letter from Douglas Meador, an Assistant Vice President. Meador responded to the deficiencies alleged in the letter and admitted that there was an error in the lost note affidavit. He concluded his letter by noting that there was no need for First Union to repurchase the loan. This lawsuit was then filed.

### III. THE SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also DeLong Equip. Co. v.*

*Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

### IV. DISCUSSION

 The plaintiff's complaint alleges fraud by misrepresentation and fraud by suppression. The elements of a misrepresentation claim are (1) a false statement (2) concerning a material existing fact, (3) reliance upon the false statement, and (4) damage as a proximate result of relying upon the false statement. *Boswell v. Liberty Nat'l Life Ins. Co.,* 643 So.2d 580, 581 (Ala.1994). The elements of a claim of fraud by suppression are (1) a duty to disclose the facts, (2) concealment or nondisclosure of material facts by the defendant, (3) inducement by the plaintiff to act, and (4) action by the plaintiff to his injury. *Wilson v. Brown,* 496 So.2d 756, 759 (Ala.1986). The defendants have attacked the sufficiency of the evidence presented by the plaintiff in opposition to the summary judgment motion on a variety of fronts.

### A. MISREPRESENTATION AND MATERIALITY

 There are clear factual disputes about what Graham and Herring were told or not

**17.** Complaint, Exhibit 14–D.

told by the defendants. However, viewing the evidence in a light most favorable to the plaintiff, the evidence establishes at least the following misrepresentations: [18]

(1) that the defendants did not have a mortgage on Lot 111 Whiterock Subdivision;

(2) that the defendants would send a power of attorney to the plaintiff so that the court record concerning the mortgage could be corrected;

(3) that the defendants had a note signed by Billy Donaldson secured by a deed of trust on Lot 111 Whiterock Subdivision;

(4) that the defendants would assign the note and other necessary documents to the plaintiff "with recourse" so that he could be a holder in due course; and

(5) that the plaintiff would be able to sue Donaldson based on the paperwork the defendants had in their possession.

 The defendants argue that none of these alleged misrepresentations were material because Graham should have known that there was an outstanding mortgage and because he paid for the assignment of the loan to keep from being sued. Under Alabama law, a "material fact" is "a fact of such a nature as to induce action on the part of the complaining party." *Bank of Red Bay v. King*, 482 So.2d 274 (Ala.1985), *citing Crigler v. Salac*, 438 So.2d 1375 (Ala.1983). Further, the misrepresentation need not be the sole inducement. "[I]t is sufficient if it materially contributes and is of such a character that the [complaining] party would not have consummated the contract had he known the falsity of the statement." *Id., citing Marshall v. Crocker*, 387 So.2d 176 (Ala.1980). The evidence viewed as it must be in a light most favorable to the plaintiff, establishes that the representation that there was no mortgage on the Whiterock Subdivision property caused Graham to close a loan over

an existing mortgage. That act then resulted in his subsequent decision to purchase the note secured by the deed of trust with recourse. His decision to repurchase the note was based on his desire to avoid future legal action and to protect his real estate business. He also, however, intended to sue Donaldson to recover the funds which he was paying for the note and deed of trust. According to Graham's testimony, he would not have bought the note if he could not sue on it. Based on the evidence before it, the court concludes that there is sufficient evidence of misrepresentation and materiality to survive summary judgment.[19]

## B. RELIANCE

 In order to prevail on his misrepresentation claim, Graham must establish that he relied on the misrepresentations of the defendants and that his reliance was reasonable. *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 421 (Ala.1997). The determination of reliance should be "based on all of the circumstances surrounding a transaction including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Id.* However, "where a party has reason to doubt the representation or is informed of the truth before he acts, he has no right to act thereon." *Bedwell Lumber Co. v. T & T Corp.*, 386 So.2d 413, 415 (Ala.1980). The defendants first argue that Graham could not have reasonably relied on the alleged misrepresentations concerning the note because he bought the note and mortgage to avoid being sued. The defendants' argument ignores the facts against it. Graham has presented evidence that the defendants told his agent Herring that there was no mortgage on the property in the Whiterock Subdivision. Had Graham not relied on that information to his detriment, he would never have been placed in the

---

**18.** Fraud by misrepresentation of fact is actionable if is the misrepresentation is willful, reckless or innocent. *See Goggans v. Realty Sales & Mortgage*, 675 So.2d 441, 442 (Ala.Civ.App.1996), *citing* ALA.CODE § 6–5–101 (1975).

**19.** The cases cited by the defendants contain the undisputed law that statements of opinion will not support an action for fraud but those cases

are simply inapposite. Further, the decision in *Ames v. Pardue*, 389 So.2d 927, 931 (Ala.1980), which is cited by the defendants for the proposition that misquoting the true amount of a mortgage is not fraud, simply holds that it is not fraud per se. It does not suggest that an act such as the misquoting of a mortgage rate could never be fraud.

position of considering whether to purchase the loan. The evidence also establishes, viewed in a light most favorable to Graham, that he purchased the note and mortgage to avoid a lawsuit but would still not have made the purchase if he knew that he could not sue Donaldson based on the papers he received from the defendants. The defendants' arguments about Graham's motives may be successful before the jury; they are not, however, sufficient for the granting of summary judgment.

The defendants also argue that Graham could not have reasonably relied on the misrepresentation of the defendants because a review of the title notes and other materials which were available to him prior to closing were sufficient to allow him to know the true facts. The defendants' argument fails on two grounds. First, Graham has presented evidence which is not yet disputed by the defendants that it is customary in the real estate loan closing business to rely on the oral representations of the lender concerning outstanding loans. Second, defendants' argument rests on a disputed factual basis. The defendants' argue:

> Had the plaintiff simply reviewed the title notes which were available to him before the closing and before the purchase of this transaction, he would have seen that the only mortgage was executed in 1976 and would have seen that the only mortgage was executed in 1976 and he would have seen by the recorded deeds that each of the successor purchasers, both the Wilsons and the Donaldsons, bought the property subject to the mortgage dated August 11, 1976 and that they had assumed the responsibility to pay the indebtedness secured by the mortgage.

The only document that defendants reference to support this argument are the assumption and release agreements executed by the Godfreys and Wilsons, and the Wilsons and Donaldsons.[20] The inferences from Graham's evidence is that he did not have any of the documents necessary to determine the validity of a future assignment before him at the

time that he closed the transaction with the Williams. In addition, as noted above, Graham has presented evidence that it was the custom and practice in the industry to rely on the representations of the lenders rather than conduct an independent investigation.

Lastly, the defendants argue that Graham cannot show reasonable reliance because Donaldson told him there was an existing mortgage on the property and the title examination notes show that the mortgage was open. Opposing those facts is the evidence presented by Graham that the defendants told Herring that there was no mortgage on Lot 111 Whiterock Subdivision. The evidence also shows that the defendants apparently believed that the mortgage at issue in this case was on property other than lot 111 because they sent appraisers to inspect the Lee County property as a prelude to foreclosure and even threatened Donaldson with foreclosure of the Lee County property. It simply cannot be said when the evidence is viewed in a light most favorable to the plaintiff that Graham's reliance was unreasonable as a matter of law. There is sufficient evidence before the court to make the reasonableness of Graham's reliance a jury question. *Goggans v. Realty Sales & Mortgage, supra.*

The last argument which the defendants make in support of the motion for summary judgment on the misrepresentation issue is that the plaintiff has failed to establish that he has suffered any damages. Graham has presented evidence from which a jury could conclude that he paid $23,552.01 for a note which was worthless. A jury could further conclude that he was required to make such an expenditure because the defendants told his agent that there was no mortgage outstanding on a Lot 111, Whiterock Subdivision. Graham has provided sufficient evidence of damages to avoid summary judgment.

## C. SUPPRESSION

The defendants argue that they are entitled to summary judgment on the

---

**20.** *See* Defendants' Brief in Support of Its [sic] Motion for Summary Judgment, filed January 21, 1998, Exhibits C and E, respectively.

suppression claim because they did not have a duty to disclose the allegedly suppressed materials. Under well-settled law, "whether a duty to disclose arises in the particular circumstances of a case depends on the relationship of the parties, the value of a particular fact, the relative knowledge of the parties and other circumstances." *Hines v. Riverside Chevrolet–Olds, Inc.,* 655 So.2d 909, 918 (Ala.1994). In this case, Graham is an experienced real estate lawyer and the defendants are engaged in the real estate financing business. Graham has presented evidence from which a jury could find that the defendants suppressed the fact that they had no note in their possession upon which he could sue if he purchased the note. He has also presented evidence from which a jury could conclude that he had no way of knowing whether such a note existed and, as he notes in his brief in support of his motion for summary judgment, there is evidence from which a jury could conclude that the mortgage lending institution had superior knowledge of the true facts.

A jury might well conclude that the facts in this case do not create a duty to disclose. However, Graham has presented sufficient evidence to require a jury to make that determination. *See Holland v. Fidelity Fin. Serv.,* 709 So.2d 1246, 1998 WL 21952 (Ala. Civ.App.1998) (Whether a party has duty to disclose certain facts must be determined on case by case basis.)

### D. PUNITIVE DAMAGES ISSUE

 Lastly, the defendants seek summary judgment on the punitive damages claim. While it appears that under Alabama state law a court may not deny a claim for punitive damages prior to trial, *see Hines v. Riverside Chevrolet–Olds, Inc.,* 655 So.2d at 926,[21] federal law is otherwise. *See Flores v. Carnival Cruise Lines,* 47 F.3d 1120 (11th Cir.1995) (affirming grant of summary judgment on a punitive damages claim because

the plaintiff made no showing of willful and wanton conduct). Consequently, the appropriate question is whether a reasonable jury, viewing the evidence in a light most favorable to the plaintiff could return a punitive damages award for the plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505.

Under the applicable Alabama law, punitive damages can be awarded in any civil action where it is proven by clear and convincing evidence that the defendant "consciously or deliberately engaged in oppression, fraud, wantoness or malice with regard to the plaintiff." ALA.CODE § 6–11–20(a). Fraud is defined as an intentional misrepresentation, deceit or concealment of a material fact the concealing party had a duty to disclose which was gross, oppressive, or malicious and committed with the intent to deprive a person of property or to cause injury. ALA.CODE § 6–11–20(b)(1). Wantonness is defined as conduct "carried on with a reckless conscious disregard for the rights or safety of others." ALA.CODE § 6–11–20(b)(3).

 In this case, Graham has presented evidence that the defendants misrepresented the existence of a mortgage thereby causing the plaintiff to close a loan over an existing mortgage. The defendants then continued the misrepresentation by taking action to foreclose on a property on which they had no mortgage and continuing to show the wrong property as the subject of the mortgage. When Graham discovered the misrepresentation and attempted to obtain an assignment of the mortgage, the defendants concealed the fact that they had no note on which he could sue even though they had represented throughout the proceedings that they had such a note. For example, the foreclosure notice sent to Billy Donaldson in September 1997 states that foreclosure is contemplated as a result of "the breach of the Note and Security Instrument." The court concludes

---

**21.** In *Hines,* the Alabama Supreme court noted that the question "whether there is clear and convincing evidence of wrongful conduct that will support an award of punitive damages does not arise until trial ..." 655 So.2d at 926. To the extent that such language precludes summary judgment on a punitive damages claim,

that language would conflict with federal law concerning summary judgment. Because this is a diversity action, Alabama substantive law applies but the standard for granting summary judgment is a procedural matter which is governed by federal law. *See Kroon v. Beech Aircraft Corp.,* 628 F.2d 891, 892 (5th Cir.1980).

that the plaintiff has produced sufficient evidence to avoid summary judgment on the punitive damages issue. The defendants may, of course, raise this issue again at trial through a motion for judgment as a matter of law. *See* Rule 50, Federal Rules of Civil Procedure.

## V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the motion for summary judgment filed by the defendants on January 21, 1998 be DENIED.